# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: CESAR IVAN FLORES; ANA
MARIA FLORES,
                              *Debtors.*

                                                    No. 11-55452

ROD DANIELSON,                                       D.C. No.
                    *Trustee-Appellant,*          6:10-29956-MJ

                    v.                                OPINION

CESAR IVAN FLORES; ANA MARIA
FLORES,
                    *Debtors-Appellees.*

Appeal from the United States Bankruptcy Court
for the Central District of California
Meredith A. Jury, Bankruptcy Judge, Presiding

Argued and Submitted
May 11, 2012—Pasadena, California

Filed August 31, 2012

Before: Harry Pregerson and Susan P. Graber,
Circuit Judges, and Edward M. Chen,* District Judge.

Opinion by Judge Chen;
Dissent by Judge Graber

---

*The Honorable Edward M. Chen, United States District Judge for the
Northern District of California, sitting by designation.

10311

## COUNSEL

Elizabeth A. Schneider, Office of Rod Danielson, Chapter 13 Trustee, Riverside, California, for the trustee-appellant.

Nancy B. Clark, M. Erik Clark, and Shannon A. Doyle, Borowitz & Clark, LLP, West Covina, California, for the debtor-appellee.

**OPINION**

CHEN, District Judge:

## I. *INTRODUCTION*

This bankruptcy appeal concerns confirmation of a Chapter 13 plan of reorganization. The debtors, Cesar and Ana Flores, proposed a three-year plan. Rod Danielson, the Chapter 13 Trustee ("Trustee"), objected and argued that a five-year plan was required. The relevant legal question is whether, under 11 U.S.C. § 1325(b), a debtor with no "projected disposable income" may confirm a plan that is shorter in duration than the "applicable commitment period" found in § 1325(b).

Current Ninth Circuit precedent plainly allows debtors to confirm a shorter plan (*e.g.*, a three-year plan) under the facts of this case. *See Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868, 872 (9th Cir. 2008). However, Trustee argued, and the bankruptcy judge agreed, that the Supreme Court's intervening decision in *Hamilton v. Lanning*, 130 S. Ct. 2464 (2010), is irreconcilable with and thus implicitly overruled *Kagenveama*'s construction of "applicable commitment period," which permits shorter Chapter 13 plans. The question before this court is whether the bankruptcy judge erred when it declined to follow this court's otherwise controlling holding in *Kagenveama* because the bankruptcy judge deemed *Kagenveama* irreconcilable with *Lanning*. We disagree and hold that *Lanning* is not clearly irreconcilable with *Kagenveama*'s construction of "applicable commitment period." Accordingly, we reverse and remand to the bankruptcy court for further proceedings consistent with this opinion.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

Cesar and Ana Flores ("Debtors") filed a petition for relief under Chapter 13 of the Bankruptcy Code. Debtors proposed a plan of reorganization with a duration of 36 months, calling

for a monthly payment of $122. Trustee objected to the plan, arguing that the Bankruptcy Code requires a minimum plan duration of 60 months and that Ninth Circuit precedent to the contrary had been implicitly overruled by an intervening Supreme Court decision. The Bankruptcy Court sustained the objection and confirmed a 60-month plan calling for a monthly payment of $148.[1]

Debtors timely appealed to the Bankruptcy Appellate Panel ("BAP"). The bankruptcy court then certified the plan duration issue for direct appeal to this court, pursuant to 28 U.S.C. § 158(d)(2).[2]

The relevant facts are not disputed: Debtors' "current monthly income," as that term is defined in the Bankruptcy Code, is above the median income for their locality. Debtors' monthly "disposable income," as that term is defined in the Bankruptcy Code, is negative. Debtors have unsecured debts. Debtors' proposed plan would pay 1% of allowed, unsecured, non-priority claims.

## III. *STANDARD OF REVIEW*

Questions of "statutory interpretation and Ninth Circuit precedent" are questions of law, which this court reviews de novo. *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011); *see also Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 637 (9th Cir. 1993) ("Whether stare decisis applies . . . [is an] issue[ ] of law, reviewable de novo.").

---

[1]As the parties confirmed at oral argument, there is no dispute on appeal over the increase from a $122 monthly payment to unsecured creditors, proposed by Debtors, and a $148 monthly payment to unsecured creditors, confirmed by the bankruptcy court. Rather, the only dispute is over the duration of these monthly payments. There is no dispute that the plan was proposed in good faith.

[2]Because Trustee filed the motion to certify for direct appeal, he was listed as Appellant in this appeal, even though he prevailed at the bankruptcy court.

## IV. *DISCUSSION*

We begin with a review of the statutory framework at issue in this case, as well as a discussion of this court's prior ruling in *Kagenveama* and the Supreme Court's intervening decision in *Lanning*.

### A. *Statutory Framework*

[1] The Bankruptcy Code imposes a number of conditions on confirmability of a plan of reorganization under Chapter 13. Among those conditions is the requirement that debtors pay any "projected disposable income" to unsecured creditors. *See* 11 U.S.C. § 1325(b)(1)(B). The statute establishing such a requirement reads in relevant part as follows:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> > (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> >
> > (B) the plan provides that all of the debtor's *projected disposable income to be received in the applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

*Id.* § 1325(b)(1) (emphasis added). Thus, for a given debtor, this subsection involves two threshold determinations: (1) the debtor's "projected disposable income," and (2) the debtor's "applicable commitment period."

In order to apply the above requirements, a court must first classify the debtor as either "above-median" or "below-median." *See, e.g.*, *In re Mattson*, 456 B.R. 75, 82 (Bankr. W.D. Wash. 2011) (using the quoted terminology for the purposes of determining the "applicable commitment period"); *In re Diaz*, 459 B.R. 86, 91 & n.6 (Bankr. C.D. Cal. 2011) (using the quoted terminology for the purposes of "projected disposable income"). As discussed in more detail below, the calculation of "disposable income" depends on whether a debtor has above-median or below-median income. § 1325(b)(3).[3] The "applicable commitment periods" in which a debtor must pay her "projected disposable income" also differ for above-median versus below-median debtors. § 1325(b)(4). In this case, Debtors are above-median. We therefore focus on the requirements for above-median debtors.

1.  *Disposable Income and Projected Disposable Income*

"The [Bankruptcy] Code [does] not define the term 'projected disposable income . . . .' " *Lanning*, 130 S. Ct. at 2469. However, the Code does define "disposable income." Section 1325(b)(2) provides, in relevant part:

> *For purposes of this subsection*, the term "disposable income" means current monthly income received by the debtor . . . less amounts *reasonably necessary to be expended* (A)(i) for the maintenance or support of the debtor or a dependent of the debtor
>
> . . . .

---

[3]An above-median debtor is simply one whose annualized "current monthly income" is greater than the applicable median family income; all other debtors are below-median. *See* 11 U.S.C. § 1325(b)(3), (b)(4) (setting forth this dichotomy without using the quoted terminology). "Current monthly income" is defined to mean, in essence, the average of the debtor's monthly income in the six months before the filing of his or her petition. *Id.* § 101(10A).

(Emphases added.) For an above-median debtor such as the Debtors in this case, § 1325(b)(3) provides:

> Amounts reasonably necessary to be expended under paragraph (2) . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) . . . .

Section 707(b)(2), in turn, sets forth a "formula . . . known as the 'means test' and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file." *Lanning*, 130 S. Ct. at 2470 n.2. Thus, the statute prescribes a formula to calculate an above-median debtor's disposable income. From that formula, a debtor's "projected disposable income" is then projected into the future to determine what monthly payment the debtor owes to unsecured creditors. § 1325(b)(1)(B). As we discuss *infra*, the exact method by which one calculates "*projected* disposable income" — a term undefined in the statute — from "disposable income" has been a topic of vigorous debate among courts until the Supreme Court's recent decision in *Lanning*.

Because the "means test" imposed by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") of 2005, Pub. L. No. 109-8, 119 Stat. 23, calculates expenses using formulaic categories keyed to local data rather than the actual expenses of an individual debtor, sometimes, as in this case, an above-median debtor who is capable of pledging a monthly sum to repayment for the benefit of creditors has negative disposable income. *See* 8 *Collier on Bankruptcy* ¶ 1325.11[4][c][I] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010); *cf. In re Alexander*, 344 B.R. 742, 750 (Bankr. E.D.N.C. 2006) ("Because the pre-BAPCPA definition of 'disposable income' calculated a real number rather than a statutory artifact, . . . a debtor with no positive number simply had no means to fund the added costs of a Chapter 13 plan."). Negative disposable income under BAPCPA can in turn result in a negative "projected disposable income," under the statute.

In the instant case, it is undisputed that Debtors have negative projected disposable income.

### 2.   *Applicable Commitment Period*

Unlike "projected disposable income," for which the meaning must be deduced from "disposable income," the Bankruptcy Code provides a precise definition for "applicable commitment period." Section 1325(b)(4) provides in relevant part:

> *For purposes of this subsection*, the "applicable commitment period" . . . shall be—
>
> (i) 3 years; or
>
> (ii) not less than 5 years, if [the debtor is above median]; and . . . may be less than 3 or 5 years, whichever is applicable . . . , but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

(Emphasis added.)

Because the Debtors will not make payment in full to unsecured creditors and they are above-median, "the applicable commitment period" under § 1325(b)(4) is five years. While the applicable commitment period is clear, its role in defining the duration of the Debtor plan of reorganization is not.

### B.   *Pre-*Lanning *Interpretations of 11 U.S.C. § 1325(b)*

Prior to the Supreme Court's decision in *Lanning*, courts diverged in their interpretation of the elements of § 1325. We summarize these disagreements below by way of background to this Circuit's law and *Lanning*'s potential impact on this case.

## 1.  *Projected Disposable Income*

First, pre-*Lanning*, courts differed as to how they interpreted the undefined term "projected disposable income" in relation to the defined term "disposable income." Two competing interpretations have been termed the "mechanical" approach and the "forward-looking" approach. *See Lanning*, 130 S. Ct. at 2471; *Kagenveama*, 541 F.3d at 871-72*; Nowlin v. Peake (In re Nowlin)*, 576 F.3d 258, 262-63 (5th Cir. 2009).

**[2]** Under the mechanical approach, " 'projected disposable income' means 'disposable income,' as defined by § 1325(b)(2), projected over the 'applicable commitment period' " by means of simple, or mechanical, multiplication. *Kagenveama*, 541 F.3d at 871-72; *see also Lanning*, 130 S. Ct. at 2471. For example, if a debtor's disposable income, according to the statutory formula, is $100 per month, and if the debtor's applicable commitment period is five years (or 60 months), the debtor's total projected disposable income is $6,000.

The forward-looking approach, by contrast, uses the "disposable income" calculation only as a "starting point," *Kagenveama*, 541 F.3d at 872, "determinative in most cases," *Lanning*, 130 S. Ct. at 2471, but subject to modification upon a demonstration of "substantial changes to the debtor's income or expenses that have occurred before confirmation or will occur within the plan's period," *Nowlin*, 576 F.3d at 263. Thus, if the debtor's income during the six months prior to filing her bankruptcy petition — the baseline used to calculate disposable income — is somehow demonstrably different from the debtor's current or future income, such changed circumstances could factor into the "projected disposable income" calculation under the forward-looking approach. For example, a debtor who lost her job after filing the petition could have a much lower monthly "projected disposable income" than her "disposable income," which was based on her previous job's paycheck. *See id.* at 263-64 (describing

potential changes such as "a promotion at work, the loss of a job, the acquiring of a second job, or increased medical expenses" (internal quotation mark omitted)).

As discussed further below, this debate was settled by the Supreme Court in *Lanning*, in favor of the forward-looking approach.

### 2. *Applicable Commitment Period*

A second debate among courts concerns whether § 1325(b)'s "applicable commitment period" sets forth a "temporal" requirement or a "monetary" requirement. The latter approach is also sometimes referred to as the "multiplier" approach. *Baud v. Carroll*, 634 F.3d 327, 336-37 & n.7 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 997 (2012). Under the temporal approach, the "applicable commitment period" establishes the minimum duration of the plan.[4] *Id.* at 336-37 (collecting cases); *see, e.g.*, *Whaley v. Tennyson (In re Tennyson)*, 611 F.3d 873, 877-78 (11th Cir. 2010) ("The plain reading of § 1325(b)(4) indicates that an above median income debtor, such as Tennyson, is obligated to form a bankruptcy plan with an 'applicable commitment period' of no less than five years, unless his unsecured debts are paid in full.").

By contrast, under the monetary approach, the "applicable commitment period" is used to define not the duration of the plan but the total sum to be paid by the debtor under the plan. It is used as a multiplier in calculating the total "projected disposable income" to be paid to unsecured creditors over the life of the plan. As the court in *Baud* explained, the monetary approach

---

[4]This approach, and all others discussed in this opinion, assumes the satisfaction of § 1325(b)'s two predicate conditions: (1) an objection by the trustee or by an unsecured creditor and (2) payments under the plan provide less than full recovery by unsecured creditors. As discussed above, those conditions are satisfied here.

does not require the debtor to propose a plan that lasts for the entire length of the applicable commitment period; rather, as long as the plan provides for the payment of the monetary amount of disposable income projected to be received over that period, the court may confirm a plan that lasts for a shorter time.

634 F.3d at 337 (collecting cases adopting this approach). Once calculated, the debtor can pay that total sum over a shorter period of time. *See, e.g.*, *In re Swan*, 368 B.R. 12, 26 (Bankr. N.D. Cal. 2007) (" '[W]here the debtor's projected disposable income is consistent with the calculations on Form B22C, it makes little sense to hold the debtor hostage for 60 months where the debtor can satisfy the requirements of § 1325(b)(1)(B) in a shorter period.' " (quoting *In re Fuger*, 347 B.R. 94, 101 (Bankr. D. Utah 2006))).

**[3]** Other courts, including this court in *Kagenveama*, have adopted a hybrid[5] variation in which the "applicable commitment period" sets the minimum temporal duration of a plan, but it is "inapplicable to a plan submitted . . . by a debtor with no 'projected disposable income.' " *Kagenveama*, 541 F.3d at 875; *see, e.g.*, *Alexander*, 344 B.R. at 751 ("Because applicable commitment period is a term the statute makes relevant only with regard to the required payment of projected disposable income to unsecured creditors and not to any other plan payments or requirements, it simply does not come into play where no projected disposable income must be taken into account."). *See generally Baud*, 634 F.3d at 337 (collecting additional cases).

In addition to the split among the lower courts, leading

[5]Because this approach somewhat overlaps in effect and reasoning with both the temporal approach and the monetary/multiplier approach, different courts have placed it in different categories. *See, e.g.*, *Baud*, 634 F.3d at 337 (categorizing as variant on temporal approach); *Tennyson*, 611 F.3d at 876 (categorizing as multiplier approach).

commentators are divided on its answer. *Id.* at 338 (citing 8 *Collier on Bankruptcy* ¶ 1325.08[4][d]; and 6 Keith M. Lundin, *Chapter 13 Bankruptcy*, § 500.1 (3d ed. 2000 & Supp. 2006)). The proper interpretation of the meaning and function of the "applicable commitment period" has not been directly addressed by the Supreme Court.

## C.   *Kagenveama*

**[4]** In 2008, this court addressed both of the questions outlined above, deciding in favor of the mechanical approach in defining "projected disposable income" and the hybrid approach in interpreting the "applicable commitment period." *Kagenveama*, 541 F.3d 868.

In support of the mechanical approach to determining "projected disposable income," *Kagenveama* first relied on textual analysis:

> The substitution of any data not covered by the § 1325(b)(2) definition [of disposable income] in the "projected disposable income" calculation would render as surplusage the definition of "disposable income" found in . . . . The plain meaning of the word "projected," in and of itself, does not provide a basis for including other data in the calculation because "projected" is simply a modifier of the defined term "disposable income."

*Id.* at 872-73. *Kagenveama* also relied on pre-BAPCPA practice, which it read to support the mechanical approach. *Id.* at 873-74 & n.2. It rejected the forward-looking approach, stating that nothing in the Bankruptcy Code supports the reading of "disposable income" as merely a presumptive starting point, subject to modification. *Id.* at 874-75. Finally, the court rejected the contention that the mechanical approach led to absurd results. *Id.* at 875.

In adopting the hybrid approach to the "applicable commitment period," *Kagenveama* stated:

> The Trustee argues that "applicable commitment period" mandates a temporal measurement, i.e., it denotes the time by which a debtor is obligated to pay unsecured creditors, while Kagenveama argues that it mandates a monetary multiplier, i.e., it is merely useful in calculating the total amount to be repaid by a debtor. Based on the plain language of the statute, *we conclude that the Trustee's interpretation is correct, but that the "applicable commitment period" requirement is inapplicable to a plan submitted voluntarily by a debtor with no "projected disposable income."*

*Id.* (emphasis added). The court reasoned that any payments made by such a debtor must derive from sources other than "projected disposable income," and so the "applicable commitment period," which is tied to that term, would be irrelevant. *Id.* at 876. The court's analysis relied on the text of the statute, and explicitly rejected policy arguments to the contrary:

> [O]nly "projected disposable income" is subject to the "applicable commitment period" requirement. Any money other than "projected disposable income" that the debtor proposes to pay does not have to be paid out over the "applicable commitment period."

> There is no language in the Bankruptcy Code that requires all plans to be held open for the "applicable commitment period." Section 1325(b)(4) does not contain a freestanding plan length requirement; rather, its exclusive purpose is to define "applicable commitment period" for purposes of the § 1325(b)(1)(B) calculation. Subsection (b)(4) states

"For purposes of this subsection, the 'applicable commitment period' . . . shall be . . . not less than 5 years" for above-median debtors. Subsection (b)(1)(B) states that "the debtor's 'projected disposable income' to be received in the 'applicable commitment period' . . . will be applied to make payments under the plan." When read together, only "projected disposable income" has to be paid out over the "applicable commitment period." When there is no "projected disposable income," there is no "applicable commitment period."

Subsections (b)(2) ("disposable income") and (b)(3) ("amounts reasonably necessary to be expended") exist only to define terms relevant to the subsection (b)(1)(B) calculation. Subsection (b)(4), which defines "applicable commitment period," is no different. . . . . Thus, the "applicable commitment period" applies only to plans that feature "projected disposable income." Here there is none.

A recent decision by the Eighth Circuit Bankruptcy Appellate Panel ("BAP") supports limiting the application of the "applicable commitment period" to plans that have "projected disposable income." *In re Frederickson*, 375 B.R. 829, 835 (2007). In *Frederickson*, the BAP held that "applicable commitment period" does not refer to a minimum plan duration, but rather it refers to the time in which the debtor must pay "projected disposable income" to the trustee. *Id.* Another statutory provision, § 1322(d),[6] governs plan duration for above median income debtors. *Id.* The BAP concluded that

---

[6]Section 1322(d) provides in relevant part that "[i]f the current monthly income of the debtor and the debtor's spouse combined, [is above median] . . . the plan may not provide for payments over a period that is longer than 5 years." 11 U.S.C. § 1322(d).

"[§ ] 1322(d) would be superfluous if § 1325(b)(4) set the length of the plan." *Id.* We find this reasoning persuasive.

   . . . We must enforce the plain language of the Bankruptcy Code as written. We may not make changes to the plain language of the Bankruptcy Code based on policy concerns because that is the job of Congress.

*Id.* at 876-77 (citations and footnote omitted) (4th ellipsis added).

**[5]** The court also noted that its interpretation was not inconsistent with pre-BAPCPA practice, which similarly provided for a temporal period (in that case, a period of "three years"). However, the court found that when a debtor had no disposable (or projected disposable) income, there was no "applicable commitment period" to apply. *Id.* at 875-76. Such a scenario — a debtor with no projected disposable income who could nonetheless make payments to unsecured creditors — did not exist pre-BAPCPA because BAPCPA replaced a debtor's actual ability to pay (based on real numbers) with a formula for calculating disposable income. *See Alexander*, 344 B.R. at 750. Thus, there was no applicable pre-BAPCPA practice with respect to debtors with no disposable income, as such debtors could not propose confirmable plans prior to the Act. *See id.* ("[A] debtor under the new 'disposable income' test may show a zero or negative number, yet may be able to make the required showing that she actually has enough income to fund a confirmable plan.").

D.   *The Supreme Court's Decision in* Lanning

**[6]** *Lanning* involved a debtor whose "current monthly income" — the pre-petition baseline from which one calculates "disposable income" under § 1325(b)(2) — was inflated well beyond her actual post-petition income because of a one-

time aberration. 130 S. Ct. at 2470 (explaining that the debtor had received a one-time buyout from her former employer prior to filing for bankruptcy, and that these one-time payments had "greatly inflated" her disposable income). In such a scenario, applying the mechanical approach to calculating her "projected disposable income" would have resulted in monetary payments that would substantially exceed her ability to pay. *Id.* The Supreme Court rejected the mechanical approach and adopted the forward-looking approach, overruling the portion of *Kagenveama* that addressed "projected disposable income." *Id.* at 2469.

In so doing, the *Lanning* Court relied primarily on a textual analysis that distinguished "projected disposable income" from "disposable income." The Court reasoned that "the ordinary meaning of the term 'projected' . . . . takes past events into account, [but allows] adjustments . . . based on other factors that may affect the final outcome." *Id.* at 2471-72; *see also id.* at 2471 ("[I]n ordinary usage future occurrences are not 'projected' based on the assumption that the past will necessarily repeat itself."). It rejected *Kagenveama*'s argument that the forward-looking approach renders the definition of "disposable income" superfluous:

> This argument overlooks the important role that the statutory formula for calculating "disposable income" plays under the forward-looking approach. As the Tenth Circuit recognized in this case, a court taking the forward-looking approach should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses.

*Id.* at 2475. The Court also looked to the meaning of "projected" in other federal statutes, which used "projected" to mean

not just "simple multiplication," but estimates adjusted for changed conditions and trends. *Id.* at 2472.

The Court further supported its conclusion by reference to pre-BAPCPA practices, which it evaluated differently than did the Ninth Circuit. *See id.* at 2472-74. Specifically, the Court noted that pre-BAPCPA courts used the mechanical approach as a starting point, but "also had discretion to account for known or virtually certain changes in the debtors' income." *Id.* at 2473-74. The Court concluded that "[i]n light of this historical practice," and because "Congress did not amend the term 'projected disposable income' in 2005," "we would expect that, had Congress intended for 'projected' to carry a specialized — and indeed, unusual — meaning in Chapter 13, Congress would have said so expressly." *Id.*

Finally, the Court considered the senseless consequences that could result from the mechanical approach:

> In cases in which a debtor's disposable income during the 6-month look-back period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended. In cases in which the debtor's disposable income is higher during the plan period, the mechanical approach would deny creditors payments that the debtor could easily make. And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements.

*Id.* at 2475-76.

**[7]** *Lanning* did not address the meaning of "applicable commitment period." Its holding only concerned the interpretation of "projected disposable income."

E.   Lanning's *Impact on* Kagenveama *and This Case*

**[8]**  In the instant case, we confront the question of *Kagen-veama*'s continued vitality in light of *Lanning*. *Lanning* necessarily overruled the first part of *Kagenveama*. *See In re Henderson*, 455 B.R. 203, 208 (Bankr. D. Idaho 2011) ("Because the Supreme Court adopted the forward-looking approach, as opposed to the *Kagenveama*-favored mechanical approach, *Kagenveama*'s instructions to bankruptcy courts for calculating debtors' projected disposable income were effectively overruled."). What remains unsettled is whether *Lanning*'s reasoning, which did not address the "applicable commitment period" question, is clearly irreconcilable with and thus effectively overruled *Kagenveama*'s second holding interpreting "applicable commitment period."

In *Miller v. Gammie*, we explained that "issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are *clearly irreconcilable*." 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (emphasis added)).

Importantly, this inquiry does not ask how the panel would interpret the "applicable commitment period" provision if we were to consider the issue as a matter of first impression. Rather, we are bound by our prior precedent if it can be reasonably harmonized with the intervening authority. *See, e.g.*, *Avagyan v. Holder*, 646 F.3d 672, 677 (9th Cir. 2011) ("A three-judge panel cannot reconsider or overrule circuit precedent unless an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point." (internal citations and quotation marks omitted)).

In this case, we find that the Supreme Court's decision in *Lanning* is not "clearly irreconcilable" with *Kagenveama*'s

interpretation of "applicable commitment period." We so conclude for two reasons. First, the overall analytical framework of *Lanning*, which (1) employed a textual analysis of statutory language at issue, (2) reviewed pre-BAPCPA practice, and (3) examined policy consequences of a contrary interpretation, is consistent with our overall analytical approach in *Kagenveama*. Second, the application of *Lanning*'s three-factor analysis in construing "projected disposable income" does not mandate any particular interpretation of the different term "applicable commitment period."

### 1. *Analytical Framework*

**[9]** The overarching analytical framework employed by the Supreme Court in *Lanning* is similar to and consistent with the analytical framework used by this court in *Kagenveama*. *Lanning* analyzed three factors. First, *Lanning* employed a textual analysis to determine the meaning of "projected disposable income" used in § 1325(b)(1) as it relates to "disposable income" defined in (b)(2) and (b)(3). Second, *Lanning* examined pre-BAPCPA practice, adopting the pre-BAPCPA approach to determining "projected disposable income" in the absence of any indication that Congress, in enacting BAPCPA, intended to change that practice. Third, it tested for possible senseless results that could arise under alternative interpretations of "projected disposable income."

*Kagenveama* employed the same general framework in its interpretation of "applicable commitment period." Like *Lanning*, the court considered the text and structure of § 1325(b) (as well as the relationship to § 1322(d)) to determine the meaning of "applicable commitment period" as it is defined in (b)(4) and used in (b)(1). *Kagenveama* also briefly considered pre-BAPCPA practice as it relates to the meaning of "period," although the precise scenario the court addressed did not have a pre-BAPCPA analog. Finally, it considered possible senseless results according to the statute's purpose, and concluded that nothing in BAPCPA's text or purpose man-

dated a minimum term length or "applicable commitment period" for debtors who had no "projected disposable income."

## 2.  *Application of the Three-Factor Framework*

**[10]**  In addition to the fact that both *Kagenveama* and *Lanning* employed the same general analytical framework, there is nothing in *Lanning*'s specific application of the three-factor framework in interpreting "projected disposable income" ("PDI") that is clearly inconsistent with *Kagenveama*'s application of that similar framework in interpreting "applicable commitment period" ("ACP").

### a.  *Text and Structure of § 1325(b)*

First, *Lanning*'s textual analysis of "projected disposable income" is *sui generis* to the issue at hand therein. "*Lanning* [did not] directly address[ ] the applicable commitment period concept at issue in *Kagenveama*." *Henderson*, 455 B.R. at 209; *see also In re Reed*, 454 B.R. 790, 801 (Bankr. D. Or. 2011) (noting that the Supreme Court has not "dealt with the interpretation of the applicable commitment period for above-median debtors who have no projected disposable income"). In *Lanning*, the Court was singularly focused on the term "projected" as that term modified "disposable income."[7] "At

---

[7]To place the holdings in *Lanning* and *Kagenveama* in context, we set forth the relevant provisions of § 1325:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> . . . .
>
>   (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

its base, *Kagenveama* relied on the plain meaning of the statutory terms and their context and relationship to each other. The Supreme Court neither rejected that approach nor the conclusion that the circuit reached with regard to 'applicable commitment period.' " *Reed*, 454 B.R. at 803; *see Henderson*, 455 B.R. at 209 ("An extended discussion of *Kagenveama*'s analysis of the Code's text and context in light of *Lanning* . . . would serve little purpose because [both] decisions focused on different portions of the Code").

Second, *Lanning* acknowledged the necessary relationship between the term "disposable income" defined in

---

. . . .

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended[.]

. . . .

(3) Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income [above the applicable median income.]

. . . .

(4) For purposes of this subsection, the "applicable commitment period"—

    (A) subject to subparagraph (B), shall be—

        (i) 3 years; or

        (ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, . . . is [above the applicable median income.]

. . . .

    (B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

§ 1325(b)(2) and (b)(3) and the undefined term "projected disposable income" used in (b)(1); the calculation of disposable income under (b)(2) and (b)(3) obviously informs the determination of projected disposable income. In contrast, the relationship between the term "applicable commitment period" as it is defined in *(b)(4)* and its use in (b)(1) is not so plain. Nothing in *Lanning* addresses how the ACP defined in (b)(4) should be applied to (b)(1).

**[11]** Third, the definition of "projected" as used in defining "projected disposable income" is functionally independent of the determination of how the applicable commitment period affects the debtor's obligation under § 1325(b)(1). The terms "projected" and "applicable commitment period" are independent variables. The only things *Lanning* changed were the potential "inputs" for determining a debtor's projected disposable income. *Kagenveama*'s essential conclusion remains untouched; namely, one who has no projected disposable income, *however calculated* under *Lanning*, is not subject to an applicable commitment period. *Kagenveama*, 541 F.3d at 877; *Reed*, 454 B.R. at 802.

We recognize that the Eleventh Circuit, considering the meaning of "applicable commitment period" as a matter of first impression, has held that "applicable commitment period" is a "temporal term that prescribes the minimum duration of a debtor's Chapter 13 bankruptcy plan" and in so holding, cited *Lanning* as supporting its conclusion:

> *Lanning* opens the door for the possibility that the final projected disposable income accepted by the bankruptcy court may not be the result of a strict § 1325(b)(1)(B) calculation. The "applicable commitment period" must have an existence independent of the § 1325(b)(1)(B) calculation. If "applicable commitment period" were left dependent upon projected disposable income . . . , then it would necessarily be dependent on the multitude of

indeterminate factors that *Lanning* has allowed to be used in the determination of projected disposable income. This in turn would leave "applicable commitment period" an indeterminate term. In order for "applicable commitment period" to have any definite meaning, its definition must be that of a temporal term derived from § 1325(b)(4) and independent of § 1325(b)(1).

*Tennyson*, 611 F.3d at 878-79.

While we need not determine whether we would reach the same conclusion were the question a matter of first impression, *Tennyson* does not demonstrate that our decision in *Kagenveama* is clearly irreconcilable with *Lanning*. *Lanning* does not, as *Tennyson* suggests, render "applicable commitment period" an "indeterminate term." Rather, under *Kagenveama*, once PDI has been calculated according to *Lanning*, "applicable commitment period" remains a fixed term of either three years or five years under (b)(4); it simply does not go into effect for debtors who have no projected disposable income.

Indeed, in *Baud*, the Sixth Circuit considered the opinions in both *Kagenveama* and *Tennyson* and acknowledged that "the plain-language arguments supporting each approach are nearly in equipoise." 634 F.3d at 351. Considering as a matter of first impression whether the applicable commitment period applies when a debtor has no projected disposable income, *Baud* simply found "the interpretation of § 1325(b) that applies the applicable commitment period to debtors with zero or negative projected disposable income to be more persuasive than the competing interpretation." *Id.* Significantly, *Baud* did not even cite to *Lanning* in the portion of its opinion that considered the textual meaning of "applicable commitment period." *Id.* at 350-51. Instead, because its textual analysis was inconclusive, "[f]or assistance in interpreting the statute, . . . [it] turn[ed] . . . to the guideposts provided by the

Supreme Court in *Lanning* and *Ransom*." *Id.* at 351. In that regard, *Baud* recognized the limited utility of *Lanning* as two of *Lanning*'s interpretive guideposts — the lack of explicit multiplier language and pre-BAPCPA practice — were inapposite with respect to the meaning of "applicable commitment period" for debtors with no projected disposable income. *Id.* The only *Lanning* "guidepost" *Baud* found useful was its mandate to avoid "senseless results." *Id.* at 352. On this question, *Baud* "conclude[d] that applying the applicable commitment period to debtors with zero or negative projected disposable income would best serve BAPCPA's goal of ensuring that debtors repay creditors the maximum amount they can afford." *Id.* at 356-57. However, even on this point, *Baud* acknowledged a substantial difference of opinion among courts as to which interpretation was preferable. *See id.* at 354-56. While the court concluded that its interpretation best comported with *Lanning*'s instruction to interpret BAPCPA so as to "maximiz[e] creditor recoveries," it did not hold that its was the only reasonable interpretation of the statute, nor did it hold that *Lanning* explicitly mandated a certain construction. *Id.* at 340. In short, *Baud* does not suggest that *Lanning* precludes a different conclusion, such as that reached in *Kagenveama*.[8]

---

[8]The dissent overlooks the textual analysis of "applicable commitment period" as interpreted by *Kagenveama* and focuses solely on the policy and purposive interpretations of BAPCPA purportedly mandated by *Lanning*. However, such an approach sidesteps the central role of textual analysis in both *Kagenveama* and *Lanning*, as well as *Kagenveama*'s explicit reasoning that we cannot ignore the statute's plain meaning in the name of upholding its purpose:

> The Trustee suggests that we should require a five-year plan for confirmation under § 1325 to allow an extended period for unsecured creditors to seek modification under § 1329. If a debtor proposes a three-year plan, receives a discharge, and experiences an increase in income in year four, then the debtor receives a windfall at the expense of creditors. While this approach would promote the sound policy of requiring debtors to repay more of their debts, there is nothing in the Bankruptcy

   b.   *Pre-Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") Practice*

   Second, *Kagenveama* does not run afoul of *Lanning*'s reliance upon pre-BAPCPA practice, *Lanning*, 130 S. Ct. at 2467, because as the Sixth Circuit observed in *Baud*, the question presented had never arisen pre-BAPCPA, 634 F.3d at 351. The precise scenario *Kagenveama* faced — the meaning of ACP for a debtor with no PDI — is one with no pre-BAPCPA analog. Such a scenario was a new question courts faced after BAPCPA, because the concept of a debtor with negative PDI did not previously exist. As one bankruptcy court has explained, "the pre-BAPCPA definition of 'disposable income' calculated a real number rather than a statutory" formula; therefore, "a debtor with no positive number simply had no means to fund the added costs of a Chapter 13 plan." *Alexander*, 344 B.R. at 750; *see also Baud*, 634 F.3d at 351-52 ("[P]re-BAPCPA practice sheds no light here because '[t]o veterans of Chapter 13 practice, it runs afoul of basic principles to suggest that a debtor with no disposable income can nonetheless propose a confirmable plan[,] [y]et BAPCPA permits precisely that.' " (alterations in original) (quoting *Alexander*, 344 B.R. at 750)). BAPCPA's standardized formula created a new scenario in which "a debtor under the new 'disposable income' test may show a zero or negative number, yet may be able to make the required showing that she actu-

-----

   Code that requires a debtor with no "projected disposable income" to propose a five-year plan. We must enforce the plain language of the Bankruptcy Code as written. *We may not make changes to the plain language of the Bankruptcy Code based on policy concerns because that is the job of Congress.* Nothing in the Bankruptcy Code states that the "applicable commitment period" applies to all Chapter 13 plans.

*Kagenveama*, 541 F.3d at 877 (emphasis added). The plain meaning of the applicable commitment period, as interpreted by *Kagenveama*, drove its analysis. As explained above, nothing about *Lanning*'s textual analysis overrules that interpretation.

ally has enough income to fund a confirmable plan." *Alexander*, 344 B.R. at 750. Thus, as *Baud* acknowledged, pre-BAPCPA practices offer no clear guidance as to whether any minimum plan length applies to debtors with negative projected disposable income.[9]

### c. *Avoiding Absurd or Senseless Results*

**[12]** Finally, under the third factor of *Lanning*'s analytical framework, *Lanning* noted that the purpose of BAPCPA was to ensure that plans did not "deny creditors payments that the debtor could easily make." *Lanning*, 130 S. Ct. at 2476; *see also Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 729 (2011) (describing "BAPCPA's core purpose [as] ensuring that debtors devote their full disposable income to repaying creditors"); *Baud*, *634 F.3d* at 356 (*Lanning* requires courts to "apply the interpretation that has the best chance of fulfilling BAPCPA's purpose of maximizing creditor recoveries"); H.R. Rep. No. 109-31(I), at 2 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 89 (describing "[t]he heart of the bill's consumer bankruptcy reforms" as designed to "ensure that debtors repay creditors the maximum they can afford").[10]

---

[9]Indeed, even as to the broader interpretive question of whether "applicable commitment period" imposes a temporal requirement or merely a multiplier (including for debtors with *positive* projected disposable income), pre-BAPCPA practice offers no clear answer. Pre-BAPCPA, § 1325(b)(1)(B) mandated that debtors pay "all of the debtor's projected disposable income to be received in the *three-year period* beginning on the date that the first payment is due under the plan." *Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355, 357 (9th Cir. 1994) (emphasis omitted) (emphasis added) (quoting § 1325(b)(1)(B)). The pre-BAPCPA practice with respect to the meaning and application of this three-year period was not uniform. *Compare, e.g.*, *In re Slusher*, 359 B.R. 290, 302-03 (Bankr. D. Nev. 2007) (stating that "most [pre-BAPCPA] courts construed the Section 1325(b)(1)(B) 'three-year period' as a temporal minimum during plan confirmation.") (collecting cases), *with, e.g.*, *In re Swan*, 368 B.R. 12, 26 (Bankr. N.D. Cal. 2007) ("Several pre-BAPCPA cases permitted debtors to payoff the plan balance and exit [C]hapter 13 in less than 36 months without paying unsecured creditors in full.") (collecting cases).

[10]The dissent points to a passage in this legislative history as supporting the notion that above-median debtors are to be held to a five-year plan

Construction of the statute should not yield senseless results as measured against BAPCPA's purpose.

[13] The bankruptcy court concluded that *Kagenveama* created absurd results that diverged from this purpose, as debtors could propose short plans that would deprive creditors of the opportunity to receive further payments if the debtors' financial circumstances improved within the five years after confirmation. However, *Kagenveama*'s construction of "applicable commitment period" does not necessarily lead to senseless results in contravention of Congress's purpose. As *Kagenveama* found, the only circumstance in which a debtor can avoid the applicable commitment period is if she has no projected disposable income. At that point, the court has already determined that there are no such "payments that the debtor could easily make" as defined by the Bankruptcy Code. *Lanning*, 130 S. Ct. at 2476. As the bankruptcy court in *Henderson* explained, "the majority in *Kagenveama* noted that requiring a plan to remain open for a specific duration where there is no projected disposable income would do noth-

---

duration (unless they pay their unsecured claims in a shorter period) because it contains the title: "Chapter 13 Plans to Have a 5-Year Duration in Certain Cases." However, we can discern no such meaning from that passage. The House Report language is ambiguous, as it states that "a chapter 13 plan may *not* provide for payments over a period that is *not* less than five years if the current monthly income of the debtor and the debtor's spouse combined exceeds certain monetary thresholds." H.R. Rep. No. 109-31(I), § 318, at 79 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 146 (emphases added). The above sentence does not mandate a five-year plan for debtors; its wording suggests five years is a maximum, a statement consistent with its citation, *inter alia*, to 11 U.S.C. § 1322(d) (setting a *maximum* plan duration of five years for above-median debtors). In addition, the House Report also refers to the bankruptcy court's ability to approve plans up to five years in length for below-median debtors, upon a showing of cause. Thus, the title's reference to "certain cases" is elastic enough to encompass a variety of situations. Accordingly, we cannot read the legislative history as providing any clear indication as to the meaning of "applicable commitment period" or its application to the instant case.

ing to further § 1325(b)(1)'s stated purpose of verifying that debtors' 'disposable income will be paid to unsecured creditors' because, under the workings of the Code, those debtors have no disposable income with which to make such payments." *Henderson*, 455 B.R. at 211 (quoting *Kagenveama*, 541 F.3d at 876).

Indeed, the fact that "projected disposable income" is to be determined under the more flexible forward-looking approach under *Lanning* adds assurance that able debtors will not escape their obligations even under *Kagenveama*'s definition of "applicable commitment period." *See Lanning*, 130 S. Ct. at 2476 (highlighting the need to ensure that projected disposable income calculations give creditors all "payments that the debtor could easily make," but not to require more than they are capable of paying so as to "deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements").

The dissent highlights one potential gap in the statute's protections for creditors — certain future increases in a debtor's income may not be sufficiently "certain" to be included in the debtor's projected disposable income under *Lanning*. However, this risk is minimal and mitigated by the fact that the applicable commitment period is not the only weapon in creditors' arsenal to ensure that Chapter 13 plans provide for the maximum payments debtors can afford. For example, debtors are required to propose plans in good faith according to § 1325(a)(3), which, although subject to some dispute post-BAPCPA, has generally been applied using a totality of the circumstances test to determine if debtors have " 'unfairly manipulated the Bankruptcy Code, or otherwise proposed their [C]hapter 13 plan in an inequitable manner.' " *In re Briscoe*, 374 B.R. 1, 22 (Bankr. D.D.C. 2007) (brackets removed) (quoting *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 (9th Cir. 1982)); *see In re Marti*, 393 B.R. 697, 700 (Bankr. D. Neb. 2008) (finding lack of good faith under § 1325(a)(3) and (a)(7) where the debtor "went from no income prior to filing

to substantial income immediately after filing" and could therefore afford to pay his creditors despite his lack of disposable income according to the statutory test).[11] "Other confirmation requirements would include the best-interests test set forth in § 1325(a)(4)." *Baud*, 634 F.3d at 352 n.19 (citing 11 U.S.C. § 1325(a)(4) (providing that, in order for a Chapter 13 plan to be confirmable, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under [C]hapter 7 of this title on such date")).

In addition, courts have used the "absurd results" rationale to justify conclusions on both sides of this debate. *See, e.g.*, *In re Williams*, 394 B.R. 550, 570 (Bankr. D. Colo. 2008) (adopting a monetary approach to the applicable commitment period because it "allows the possibility that a debtor will pay

---

[11]We do not address in this opinion the full scope of the good faith requirement in § 1325(a)(3) and how it interacts with § 1325(b) and other requirements of the Bankruptcy Code. However, we note that, although the dissent points to (*In re Lepe*) in support of its contention that compliance with *Kagenveama* could foreclose a bad faith argument based on, *e.g.*, a short payment plan of only a few months, *Lepe* specifically lists "[t]he probable or expected duration of the plan," as well as "[t]he debtors' employment history, ability to earn, and likelihood of future increases in income" as factors the bankruptcy court may consider in assessing the good faith requirement. *See Meyer v. Lepe (In re Lepe)*, 470 B.R. 851, 857 (B.A.P. 9th Cir. 2012) (internal quotation marks omitted). Indeed, *Lepe* made clear that bankruptcy courts must reject any *per se* applications of the good faith requirement based on any one factor, and must instead engage in a detailed, case-by-case determination of good faith based on the totality of the circumstances, including plan duration. *See id.* at 856-58; *see also id.* at 862 (quoting, *e.g.*, *Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 854 (B.A.P. 9th Cir. 2012) (" '[A] debtor's lack of good faith cannot be found based *solely* on the fact that the debtor is doing what the Code allows.' ") (emphasis added). Thus, even if a short payment plan is not sufficient to constitute the *sole* basis for a bad faith finding, *Lepe* does not foreclose a bankruptcy court from considering it as one among many factors.

off his unsecured creditors more quickly," increases the present value of the payments, and "reduces the chances of a default on plan payments"). Some courts have rejected a strict temporal approach to the applicable commitment period for debtors without projected disposable income, reasoning that such debtors

> are not required to pay anything to unsecured creditors because of the mandatory calculation of income and expenses under §§ 1325(b)(2) and (b)(3). The trustee would require debtors who can pay arrearages on secured debt during the initial months of the plan to keep their cases open for 60 months with plan payments of $0 and a payout to unsecured creditors of $0. Debtors would be kept in a pointless bankruptcy "limbo" in which no payments are owed but no discharge is granted. As the court noted in *In re Fuger*, 347 B.R. 94, 101 (Bankr. D. Utah 2006), "[I]t makes little sense to hold the debtor hostage for 60 months where the debtor can satisfy the requirements of § 1325(b)(1)(B) in a shorter period."

*In re Mathis*, 367 B.R. 629, 634 (Bankr. N.D. Ill. 2007).

Arguably, there are potentially perverse results for creditors when debtors who have no obligation to propose any payments to unsecured creditors because they have no projected disposable income, are nonetheless forced to propose only 60-month plans in which to pay priority and administrative claims. As the bankruptcy court in *In re Burrell* explained:

> Here, Debtors are proposing to pay the IRS, their attorney, and the Trustee as required. There is no dispute that their monthly projected disposable income is a negative number. Thus, there is also no dispute that they are not required to propose to pay any amount to unsecured creditors in order to obtain confirmation of their Plan. The amount that they are

proposing to pay unsecured creditors is completely gratuitous. The Debtors have established the feasibility of their Plan by filing a Schedule J showing that they intend to live on a budget which includes less for living expenses than they would be allowed to spend as reasonable and necessary expenses per the required statutory calculation of their disposable income. *See* 11 U.S.C. § 1325(b)(3).

If required to amend their Plan to provide for a five year duration, Debtors could reduce their monthly payment amounts to the Trustee so that the same aggregate amount would be paid over the longer duration. This would mean that the IRS and Debtors' attorney would get smaller distributions each month than now proposed and would bear the loss of the time value of money by reason of the deferral of the payments to them. But, the Code does not require the Debtors to stretch out payments to the IRS and their attorney for five years. The applicable commitment period, under any interpretation, applies only to the treatment of general unsecured creditors. *See* 11 U.S.C. § 1325(b)(1). There is, therefore, simply no basis to deny confirmation of a Chapter 13 plan which proposes to pay priority and administrative claims sooner rather than later. The Code does not require the IRS to be paid at a slower pace than Debtors are willing and able to pay simply to ensure that the case stays open for five years on the chance that Debtors will have a significant increase in income and can then be required to modify their Plan to pay more to unsecured creditors.

*In re Burrell*, No. 08-71716, 2009 WL 1851104, at *4-5 (Bankr. C.D. Ill. June 29, 2009).

**[14]** In sum, there is no singular view as to which interpretation of the ACP would best fulfill BAPCPA's purpose. We

cannot say that *Kagenveama*'s interpretation of the ACP and its effect under § 1325(b)(1) will lead to senseless results in contravention of Congress's purpose in enacting the BAP-CPA. In this regard, *Kagenveama* is not inconsistent with *Lanning*.

## V.  *CONCLUSION*

**[15]** As one court has noted, "many jurists and commentators have written . . . ably on this issue" and "cogent arguments, both of statutory construction and of bankruptcy policy, have certainly been made" on all sides. *In re Moose*, 419 B.R. 632, 635 (Bankr. E.D. Va. 2009). Were we writing on a clean slate, the contrary conclusion reached by the Sixth and Eleventh Circuits on this question would deserve consideration. The Trustee raises legitimate policy considerations as to why a mandated plan length might be desirable even when debtors have no projected disposable income. The dissent highlights some of these legitimate policy concerns. However, we do not write on a clean slate. Instead, our analysis is constrained by our own prior authority, which we are bound to follow unless it is clearly irreconcilable with *Lanning*. We are not convinced that *Lanning* has "undercut the theory or reasoning underlying [*Kagenveama*] in such a way that the cases are *clearly irreconcilable*." *Gammie*, 335 F.3d at 900 (emphasis added). Thus, only the Supreme Court or an en banc panel of this court may revisit *Kagenveama*'s holding regarding the applicable commitment period.

**[16]** Accordingly, we conclude that the bankruptcy court erred in disregarding *Kagenveama*.

REVERSED AND REMANDED.

GRABER, Circuit Judge, dissenting:

I respectfully dissent. In my view, we are not compelled to follow *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868 (9th Cir. 2008), because it is "clearly irreconcilable" with *Hamilton v. Lanning*, 130 S. Ct. 2464 (2010). *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (stating principle that a three-judge panel is not bound by a prior circuit precedent in this circumstance).

*Kagenveama* created a rule under which our circuit set no minimum duration on plans confirmable by certain debtors, such as the ones in this case. *See* 541 F.3d at 877 (holding that, when a debtor's projected disposable income was negative, the applicable commitment period "did not apply" and offering no substitute durational requirement).[1] That aspect of *Kagenveama* is clearly irreconcilable with *Lanning*, which interprets 11 U.S.C. § 1325(b) (the "disposable income test") as a vehicle for achieving the congressional intent of making debtors pay as much as they can, but no more, over a fixed period, while allowing discretion to adjust the payout up or down as required by the debtor's evolving financial situation. In *Lanning*, the Court rejected the practical consequences resulting from a "mechanical" calculation of projected disposable income, reasoning:

> In cases in which a debtor's disposable income during the 6-month look-back period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce *senseless results that we do not think Congress intended*. In cases in which the debtor's disposable income is higher during the plan period, *the mechanical approach would deny creditors payments that the debtor could easily make.*

---

[1] Indeed, Trustee represents that, in the wake of *Kagenveama*, some debtors have proposed plans as short as six months.

And where, as in the present case, the debtor's dis-
posable income during the plan period is substan-
tially lower, the mechanical approach would deny
the protection of Chapter 13 to debtors who meet the
chapter's main eligibility requirements.

130 S. Ct. at 2475-76 (emphases added).

*Lanning* involved *pre*-confirmation adjustments to plan
payments, "to account for known or virtually certain changes"
in a debtor's income. *Id.* at 2475. But, to avoid "deny[ing]
creditors payments that the debtor could easily make," *Lan-
ning*'s logic must also require a mechanism for *post*-
confirmation adjustments for unforeseen increases in a debt-
or's income.[2] That mechanism is the plan modification proce-

---

[2]The majority observes that creditors will be able to capture the benefit
of increases to a debtor's income because of Lanning's flexible and
forward-looking approach to calculating projected disposable income.
Maj. op. at 10340. But *Lanning* applies only to *known*, or "virtually cer-
tain," increases in income. 130 S. Ct. at 2475. *Lanning* does not allow
courts discretion to consider foreseeable yet uncertain increases to a debt-
or's income. Consider, for example, a law student who has secured a
lucrative associate position, contingent on passing a bar examination. For
the purposes of Chapter 13 eligibility, assume further that the law student
is also working part time. *See* 11 U.S.C. § 109(e) (requiring that an indi-
vidual have regular income in order to be eligible for relief under Chapter
13). The law student's income will foreseeably increase in the near future,
but that increase is not "virtually certain," so *Lanning* does not allow con-
sideration of the potential increase in calculating projected disposable
income. Thus, under *Kagenveama*, such a debtor can propose a plan that
terminates before he or she starts the new job, thereby denying creditors
payments that the debtor could easily make in the future.

The majority offers § 1325(a)(3)'s good faith requirement as a solution
to this problem, but compliance with *Kagenveama*'s reading of the Bank-
ruptcy Code may foreclose any bad faith argument. *See Meyer v. Lepe (In
re Lepe)*, 470 B.R. 851 (B.A.P. 9th Cir. 2012) (concluding that bad faith
cannot rest solely on a plan's attempt to do that which the Bankruptcy
Code allows).

Finally, none of the majority's solutions contends with the problem of
*unforeseen* increases in a debtor's income.

dure of 11 U.S.C. § 1329. *See Kagenveama*, 541 F.3d at 877 ("If [the debtor's] income changes in the future before completion of the plan, the Trustee or the holder of an unallowed secured claim may seek modification of the plan under § 1329."). That mechanism would be illusory unless a plan has *some* minimum duration.[3] *See id.* at 879 (Bea, J., dissenting in part) ("The five-year requirement of § 1325 . . . is a necessary component of plan modification. If the plan is not continued for a five-year period (post-confirmation), an unsecured creditor who discovers the debtor's finances have dramatically improved will find that there is no extant plan to modify.").[4] Accordingly, *Lanning* precludes any reading, such as *Kagenveama*'s, that imposes *no* minimum duration on a Chapter 13 plan.

The majority suggests that my interpretation ignores the " '*plain language of the Bankruptcy Code*' " and does so merely for reasons of policy. Maj. op. at 10337 n.8 (quoting *Kagenveama*, 541 F.3d at 877). Not so. My approach is motivated not by policy concerns, but by fidelity to *Lanning*'s

---

[3]The imposition of a minimum duration is consistent with Chapter 13's fundamental nature as a mechanism for voluntary repayment over time by wage earners, as distinct from lump-sum liquidation under Chapter 7. *See generally* 8 *Collier on Bankruptcy* ¶ 1300.02 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

[4]In *Baud v. Carroll*, 634 F.3d 327, 354-57 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 997 (2012), the Sixth Circuit presented a more thorough discussion of whether a longer plan period would necessarily provide a longer time for plan modification, analyzing a separate question regarding the interpretation of the phrase "completion of payments" for the purposes of plan modification under § 1329. That court declined to resolve the § 1329 question, concluding that it did not affect the analysis of the issue on appeal. *See id.* at 356 ("The meaning of 'completion of payments' under § 1329(a) is an interesting question that is not before us and therefore must await another day.").

The parties here do not raise or discuss the "completion of payments" question. I agree with the Sixth Circuit that the "applicable commitment period" question can and should be resolved without delving into the "completion of payments" question.

view of congressional intent. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. *In such cases, the intention of the drafters, rather than the strict language, controls*." (emphasis added) (citation, internal quotation marks, and brackets omitted)).

The need for a minimum plan duration, then, leads to the conclusion that *Kagenveama* cannot be reconciled with *Lanning* and leaves it to this court to decide what that duration should be in the case of a debtor with negative disposable income. In my view, we should answer that question by looking to the statutory provision that comes closest to setting a minimum plan duration—the "applicable commitment period" definition. That is, so long as some minimum duration is necessary, it makes sense to derive that duration from the definition of "applicable commitment period," as the Sixth and Eleventh Circuits have done. *Baud*, 634 F.3d 327; *Whaley v. Tennyson (In re Tennyson)*, 611 F.3d 873 (11th Cir. 2010). Furthermore, the legislative history of the disposable income test supports that approach:

> *Chapter 13 Plans To Have a 5-Year Duration in Certain Cases*. Paragraph (1) of section 318 of the Act amends Bankruptcy Code sections 1322(d) and 1325(b) to specify that a chapter 13 plan may not provide for payments over a period that is not less than five years if the current monthly income of the debtor and the debtor's spouse combined exceeds certain monetary thresholds. If the current monthly income of the debtor and the debtor's spouse fall below these thresholds, then the duration of the plan may not be longer than three years, unless the court, for cause, approves a longer period up to five years. The applicable commitment period may be less if the plan provides for payment in full of all allowed

> unsecured claims over a shorter period. Section 318(2), (3), and (4) make conforming amendments to sections 1325(b) and 1329(c) of the Bankruptcy Code.

H.R. Rep. No. 109-31(I), § 318, at 79 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 146 (emphasis added). The quoted section is confusingly worded, but the title suggests that above-median debtors are to be held to a five-year minimum plan duration without regard to their expenses or disposable income, unless they pay unsecured claims in full over a shorter period.

The majority admits that, as between the two competing statutory interpretations at the heart of this case, neither is necessarily more correct than the other. Maj. op. at 10335-36, 10344. The majority also concedes that, were it "writing on a clean slate, the contrary conclusion reached by the Sixth and Eleventh Circuits on this question would deserve consideration." *Id.* at 10344. Because our circuit's rule is clearly irreconcilable with later Supreme Court precedent, we *are* writing on a clean slate. In so doing, we should consider most strongly the intent of Congress (to require debtors to pay creditors what they can readily afford) and the need for national uniformity in the application of the federal bankruptcy laws. Those two factors compel the conclusion that *Kagenveama* no longer is good law. I would therefore adopt the holdings of our sister circuits and affirm the bankruptcy court's decision.